**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

REYBOLD VENTURE GROUP IX, LLC, )
a Delaware limited liability company, )
                               )
               Plaintiff, )
       v. )  C.A. No. 2020-0982-SEM (MTZ)
                               )
SUMMIT PLAZA SHOPPING CENTER, )
LLC, a Delaware limited liability company, )
                               )
               Defendant. )

## <u>ORDER ADDRESSING EXCEPTIONS</u>

**WHEREAS:**[1]

A.      Plaintiff Reybold Venture Group IX, LLC ("Reybold") filed this action seeking to enforce a purported easement encumbering the neighboring parcel owned by Defendant Summit Plaza Shopping Center, LLC ("Summit" and the "Summit Parcel") in favor of Reybold's adjoining parcel (the "Reybold Parcel").[2]  The disputed easement was purportedly created by a note (the "Note") contained in a

---

[1] On review of exceptions to a magistrate's post-trial final report, I have conducted a *de novo* review and concluded the following facts were proven by a preponderance of the evidence. *See DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999). References to the admitted and undisputed facts in the Pretrial Stipulation and Order ("PTO," Docket item ("D.I.") 55) are cited as "PTO "¶ __." Citations in the form "[Last Name] Tr. at __" refer to trial testimony of the referenced witness, available at D.I. 66. Joint trial exhibits are cited as "JX __." The Magistrate's final post-trial report (D.I. 79) is cited as "Final Report at __."

[2] *See* D.I. 1.

subdivision and development plan recorded in November 1983 (the "Record Plan").[3]

Summit and Reybold disagree as to whether the Note evidences the requisite intent by the original owner of both parcels to create an easement in favor of the Reybold Parcel that Reybold can enforce.

B.    The Record Plan was developed in 1983 to support Viola Carter's sale of the Summit Parcel to Summit's predecessor, a developer (the "Developer") with plans to build a shopping center on the parcel. That proposed development required rezoning the Summit Parcel.[4]

C.    The development process involved three steps.[5] First, the applicant submits to New Castle County (the "County") an exploratory plan with a sketch of the proposed subdivision and "the general proposed location for buildings [and] parking."[6] Then, if the exploratory plan "conforms to the zoning [and] looks to be generally acceptable," the applicant may move to the second step of submitting a

_____

[3] D.I. 1 ¶¶ 8–11, 14.

[4] PTO ¶ 5; JX 22.

[5] I rely on and give appropriate weight to the expert testimony concerning the development process. Reybold presented two experts at trial: Delaware real estate attorneys Richard Forsten and Larry Tarabicos. *See* Forsten Tr. at 3–4; Tarabicos Tr. at 95–96. Summit presented one expert at trial: retired civil engineer Carmine Casper. *See* Casper Tr. at 177–78. These experts testified consistently about the three-step process. *See, e.g.*, Forsten Tr. at 9–11; Tarabicos Tr. at 107 ("You had a three-step process."); Casper Tr. at 183–98 (describing the process and confirming that it was "typically how record plans were submitted and approved . . . [from a]bout 1975 up to about 1990").

[6] Forsten Tr. at 9; *see also* Tarabicos Tr. at 124; Casper Tr. at 183–84.

preliminary plan containing "more engineering, more detail, [and] more calculations."[7] That preliminary plan is reviewed by the County's Department of Planning's Subdivision Advisory Committee (the "SAC").[8] The SAC comprises state and local agencies, including the Delaware Department of Transportation ("DelDOT"), called the Delaware Division of Highways at the time;[9] the "Department of Public Works"; and the "[s]tate fire marshal."[10] Finally, the Department of Planning aggregates the various agencies' comments to the preliminary plan and provides them to the applicants for incorporation into the final record plans.[11]

D.    The Developer retained the engineering firm Franco R. Bellafante, Inc. ("Bellafante") to navigate that three-step process.[12] Bellafante submitted the

---

[7] Forsten Tr. at 9–10; Tarabicos Tr. at 124; Casper Tr. at 184–85.

[8] Forsten Tr. at 9–10; Tarabicos Tr. at 106–07; Casper Tr. at 181–82.

[9] Forsten Tr. at 13 ("It says Division of Highways.  That's DelDOT.").

[10] Tarabicos Tr. at 119–20 (identifying the SAC members to include "DelDOT, DNREC," "Department of Natural Resources and Environmental Control," "Department of Public Works," "[m]aybe someone from the Department of Education," and the "[s]tate fire marshal"); *see also* Casper Tr. at 185 ("[The SAC is] made up of different members.  Like I said, the fire marshal, the highway department, DNREC, Department of Public Works and Department of Education.  Other departments in the city -- in the county and state.").

[11] Heisler Tr. at 81 (testifying the County was "the aggregator" of comments from various agencies); *id.* at 93.

[12] JX 2 (identifying Bellafante as the "agent of [the Developer]"); *see also* Tarabicos Tr. at 122 (testifying that "[t]he civil engineer" "[wa]s typically responsible for submitting a record plan to the County").  There is no evidence that Carter was involved in selecting or retaining Bellafante.  *See* Tarabicos Tr. at 122–23 ("Q: Thank you.  And do you know who hired Franco Bellafante?  A:  I really don't.  I've seen reference to [the Developer].").

3

exploratory plan,[13] prepared the preliminary plan for the SAC's comments,[14] and incorporated those comments into the final plan submitted for the County's approval.[15]

E.      The Department of Planning found Bellafante's exploratory plan "generally satisfactory[,] except for compliance with" certain comments unrelated to the Note.[16] Bellafante promptly submitted a preliminary plan.[17]

F.      The SAC discussed the preliminary plan on August 8, 1983, and members provided comments.[18] DelDOT gave its comments to Bellafante the same day.[19] DelDOT's first comment to Bellefante read:

> 1.) The proposed access location is found to be acceptable, however, planning considerations regarding future access should be given at this time for development of other lands of Viola Carter. This could be a critical issue since we would not want additional access points affecting the operation of the N. Broad Street and U.S. Rt. 301 intersection.[20]

---

[13] JX 2; JX 50; *see also* Tarabicos Tr. at 127; Casper Tr. at 182–83.

[14] Casper Tr. at 184; *see also* JX 4; JX 7; JX 8; JX 9; JX 10.

[15] JX 12; *see also* Casper Tr. at 192–93, 196–97.

[16] JX 3. The comments to the exploratory plan requested "additional parking spaces," "[i]ndicat[ing] the area reserved for the restaurant," "[s]how[ing] the handicapped parking," and "[s]ubmit[ting] a landscape plan[.]" *See* JX 3.

[17] The record does not include Bellafante's actual preliminary plan as submitted, but includes a Department of Planning letter acknowledging receipt of that plan. *See* JX 4.

[18] JX 5.

[19] JX 7.

[20] *Id.*

Two days later, DelDOT told the Department of Planning simply:

> 1.) The proposed access location as shown on the preliminary plan is found to be acceptable.[21]

Although the parties were aware of the difference between DelDOT's two comments, they offered no evidence explaining that difference.[22]

G. The Department of Planning and DelDOT discussed Bellafante's preliminary plan the next day.[23] According to an internal memorandum memorializing those discussions,

> [DelDOT] would be amenable to pursuing a cross-easement agreement between subject parcel and the R–2 parcel with respect to combined entrance-exit facilities in the future when and if the adjacent residential parcel is developed with a use or uses other than residential. [DelDOT] agreed and said that [it]s comments would be forthcoming and will state basically the above.[24]

H. The Department of Public Works also provided its comments to Bellafante's preliminary plan.[25] The last comment stated that with respect to debris

---

[21] JX 10. The other comments remain unchanged between DelDOT's comments to Bellafante and to the Department of Planning. *Compare* JX 7 *with* JX 10.

[22] *See* Tarabicos Tr. at 121 (Summit's counsel observing that JX 7 and JX 10 "have the same date," "are very similar" but "not [the same]"). Despite acknowledging the difference in DelDOT's two comments, the parties treated them as identical. *See id.* at 129 ("Q: So the comments that we looked at from DelDOT from August 8th -- that would be JX 7 and JX 10[.]"); *see also id.* at 138 ("Q: But you will see, just looking at JX 10 -- and I believe it's also on JX 7.").

[23] JX 11.

[24] *Id.*

[25] JX 9.

disposal, "[i]f no debris is to be buried on this site, a *note* must be included that states no debris is to be burie[d] on this site."[26]

I.    The State Fire Marshal likewise commented on Bellafante's preliminary plan.[27] One of the comments provided that "[p]rior to Record Plan approval, the following shall be required: . . . [p]rovide *plan note* stating that all fire lanes, fire hydrants, sprinkler and standpipe connections and fire exits shall be marked and/or protected in accordance with State Regulation No. 14."[28]

J.    The SAC aggregated its members' comments and provided them in a memorandum addressed to Bellafante, copying the Developer.[29] The memorandum concluded "[t]he Department of Planning finds that this [preliminary] plan is generally satisfactory except for compliance with the following [comments]."[30] The fifth comment read:

> 5) Please add the following *note* to the plan:
>
> > "A cross-easement is hereby established between subject parcel and other lands of Viola Carter for vehicular and pedestrian traffic. Also a combined entrance-exit facility may be required in the future when and if the lands labeled

---

[26] *Id.* (emphasis added).

[27] JX 8.

[28] *Id.* (emphasis added).

[29] JX 12.

[30] *Id.*

6

'other lands of Viola Carter' are developed for use or uses other than residential."[31]

K.      Bellafante incorporated the SAC's comments into its "Check Print,"[32] the precursor of the final plan,[33] and submitted the Check Print to the SAC[34] and its members for the final approval of the Record Plan.[35]

L.      The Check Print specified the area for "right-of-way dedicated to the public use," and included a new "NOTES" section with certain bullet points.[36]  The fourth bullet incorporated verbatim the State Fire Marshal's requested "plan note," stating that "[a]ll fire lanes, fire hydrants, sprinkler and standpipe connections, and fire exits shall be marked and/or protected in accordance with State Regulation No. 14."[37]  And the first bullet addressed DelDOT's request that the plan add a "note" regarding the cross-easement, echoing the request nearly word-for-word.[38] That is the Note in dispute in this action:

---

[31] *Id.* (quotation marks in original; emphasis added).

[32] JX 13.

[33] Casper Tr. at 194 ("Q.  And can you remind me, what is the purpose of the check print? A.  To make sure that all of the County's requests from the SAC meeting were incorporated into the final record plan.").

[34] JX 14.

[35] *See* Casper Tr. at 194.

[36] *Compare* JX 13 (the Check Print), *with* JX 50 (the exploratory plan).

[37] *Compare* JX 13 (the Check Print), *with* JX 8 (the State Fire Marshal's comments relayed to the SAC).

[38] JX 13.

A cross easement is hereby established between the subject parcel and other lands of Viola Carter, for vehicular and pedestrian traffic. Additionally, a combined entrance/exit facility may be required in the future when and if the lands labeled "other lands of Viola Carter" are developed for uses other than residential.[39]

M.     On September 23, the Department of Planning approved the Check Print.[40]  Bellafante received the memorandum of approval a few days later.[41]  By letter dated October 5, Bellafante provided the Developer "two (2) Preliminary Prints of the Record Plan for Summit Plaza, for you to review with the Carters."[42] This is the first indication of Carter's potential involvement in the development approval process.[43]  The record contains no evidence regarding if or when the Developer discussed those prints with Carter.

N.     The Note appeared in the final Record Plan.[44]  The Note is the first of eight appearing under a "NOTES" section of the Record Plan.  It states:

A CROSS EASEMENT IS HEREBY ESTABLISHED BETWEEN THE SUBJECT PARCEL AND OTHER LANDS OF VIOLA CARTER, FOR VEHICULAR AND PEDESTRIAN TRAFFIC.      ADDITIONALLY,   A

---

[39] *Id.*

[40] JX 15.

[41] *Id.*

[42] JX 16.  The record does not include those Preliminary Prints. Because Bellafante sent the letter after receiving approval of the Check Prints, it is reasonable to infer that the "Preliminary Prints" enclosed in Bellafante's letter are the approved Check Prints.

[43] *Id.*

[44] JX 22.

COMBINED ENTRANCE/EXIT FACILITY MAY BE REQUIRED IN THE FUTURE WHEN AND IF THE LANDS LABELED "OTHER LANDS OF VIOLA CARTER" ARE DEVELOPED FOR USES OTHER THAN RESIDENTIAL.[45]

The "subject parcel" is the Summit Parcel.[46] The "other lands of Viola Carter" include the Reybold Parcel.[47] The parties do not dispute that the Note was requested by DelDOT and was a requirement to obtain DelDOT's approval.[48]

O. By signature dated October 28, Carter signed a Certification of Ownership contained within the Record Plan.[49] This signature is Carter's only documented involvement.

P. In the final step of approving the Record Plan, Bellafante obtained letters of no objection from DelDOT, the State Fire Marshal, and the Department of Public Works.[50] On November 3, the Department of Planning approved the final Record Plan; the County approved it by resolution dated November 8.[51]

---

[45] PTO ¶ 6; *see also* JX 22 (capitalization and quotation marks in original).

[46] PTO ¶ 7.

[47] PTO ¶ 8.

[48] *See* PTO ¶ 15; *see also* Heisler Tr. at 79 ("DelDOT requested the [N]ote."); Casper Tr. at 190 (agreeing the "DelDOT's comments end up becoming" the Note).

[49] JX 22.

[50] *See* Casper Tr. at 194–96; JX 17; JX 18; JX 19.

[51] JX 20; JX 21.

Q.   By deed dated September 20, 1984, Carter conveyed the Summit Parcel to the Developer.[52]   The Summit Parcel has since been improved with a strip shopping center known as Summit Plaza.[53]   Each subsequent deed in the Summit Parcel's chain of title references the Record Plan, which contains the Note.[54]   Each deed in the Summit Parcel's chain of title from 1987 forward recites that the conveyance is subject to all easements and restrictions of record.[55]   The parties do not dispute the Summit Parcel is subject to any legacy easements and restrictions of record.

R.   When the Record Plan was recorded, it was subject to the 1982 version of the New Castle County Code.[56]   Specifically, Section 20-70(a) of the New Castle County Code provided:

---

[52] JX 23; *see also* PTO ¶ 10.

[53] PTO ¶ 3.

[54] PTO ¶ 10.

[55] *Id.*

[56] *See* PTO at 2 n.1, 6–7 (parties agreeing that the Record Plan is subject to the New Castle County Code in effect in 1983).  When the Record Plan was recorded, the Summit Parcel and the other lands of Viola Carter were located within the jurisdiction of the New Castle County.  Those properties have since been annexed to the Town of Middletown, Delaware, and are within the jurisdiction of Middletown.  *See* Heisler Tr. at 60.  Jerome S. Heisler is Reybold's managing partner, and one of the Reybold Parcel's owners.  *See* Heisler Tr. at 50–51.  Events relevant to the creation and recordation of the Record Plan that underlie this action predated the annexation and were therefore governed by the New Castle County Code.

10

**Sec. 20-70. Specific compliance.**

(a)  The provisions of this chapter, pursuant to which a record plan has been approved and *all notations appearing on a record plan*, other than those pertaining to certificates of occupancy, when the record plan is duly recorded, *shall have the effect of restrictive covenants* and shall run with the land covered by the record plan against the owners who have executed the record plan, their heirs, successors and assigns and *in favor the county council* until the record plan is amended or superseded; provided, that *the right to enforce such covenants shall lie exclusively with the county council* and the fact that several parcels belonging to different owners are similarly restricted or that a restricted parcel is divided among several different owners, *shall not imply the creation of any private property or contract rights*, on account of reliance or otherwise, among or between such several owners.[57]

S.  Summit bought the Summit Parcel in 2012,[58] and has continued to operate the various retail spaces in the Summit Plaza.[59]

T.  Reybold bought the Reybold Parcel in 2020,[60] and seeks to construct a self-storage facility and retail space on it.[61]  DelDOT has approved Reybold's plan for a "rights in, rights out" entrance permission that allows vehicular traffic to make

---

[57] New Castle Cty. C. § 20-70(a) (1982) (emphases added); *see* D.I. 9 Ex. A (excerpting Section 20-70(a)).

[58] JX 34.

[59] Perry Tr. at 215–16.  Allen Perry was the former manager of, and is now a consultant to, the organization that owns the Summit Plaza.  Perry Tr. at 215.

[60] *See* Heisler Tr. at 57, 64.  The record does not include a final or draft version of the Agreement of Sale, nor an executed version of the Third Amendment.  For purposes of this Order, when Reybold acquired the Reybold Parcel does not matter.

[61] PTO ¶ 4.

11

right-hand turns to enter and exit the Reybold Parcel.[62] Reybold seeks an easement burdening the Summit Parcel that would allow cars exiting the Reybold Parcel to go onto the Summit Parcel and make left-hand turns, increasing the Reybold Parcel's value.[63] The Town of Middletown's approval of Reybold's plan is pending resolution of this easement issue.[64]

U. On November 13, 2020, Reybold commenced this action seeking to enforce Reybold's right to the easement purportedly created by the Note in the Record Plan. Reybold sought a declaratory judgment, an order quieting title, and injunctive relief against Summit. Reybold claims Carter intended and created an easement enforceable by Reybold, by signing and certifying her ownership on the Record Plan containing the Note.[65] Summit disagrees, and refuses to allow vehicular and pedestrian traffic across the Summit Parcel.[66] Summit argues the Note is a "notation" under Section 20-70(a) and, therefore, is a restrictive covenant for the County's benefit and enforceable only by the County.[67] Summit argues neither the

---

[62] Heisler Tr. at 57–58.

[63] *Id.* at 58; *see also* JX 49 (DelDOT representative explaining that the exit facility located on the Summit Parcel "is the only location where DelDOT would allow full access").

[64] Heisler Tr. at 57, 62.

[65] D.I. 70 at 1–2, 5, 8; D.I. 77 at 4; D.I. 86 at 2, 8, 11–12; *see also* Heisler Tr. at 54, 60.

[66] PTO ¶ 11.

[67] D.I. 73 at 3–4, 23–24, 29–32; D.I. 84 at 2, 35–41.

Note nor the Record Plan evidences Carter's intention to create a private right of easement.[68]

V. A Magistrate in Chancery held a one-day trial on November 8, 2023.[69] The parties introduced 50 exhibits. Three fact witnesses and three experts testified live.[70] Post-trial briefing was completed on March 22, 2024.[71] On July 31, the Magistrate issued a Final Post-Trial Report (the "Final Report").[72] The Final Report grants declaratory relief to Reybold, concluding the Note reflects an express easement burdening the Summit Parcel that Reybold can enforce.[73]

W. On August 9, Summit filed a Notice of Exceptions to the Final Report, specifically its conclusion that Reybold was entitled to declaratory relief.[74] The

---

[68] D.I. 73 at 4, 21–25; D.I. 84 at 27–32.

[69] D.I. 65; D.I. 66.

[70] D.I. 66 at 237.

[71] D.I. 70; D.I. 73; D.I. 77.

[72] D.I. 79.

[73] Final Report at 1, 14, 22, 24. The Final Report construes the Note according to "contract principles," and finds Carter through the Note "expressly reserved an easement," which became effective when the Summit Parcel was sold to the Developer. Final Report at 15–18. The Final Report considers Section 20-70(a) "irrelevant," having construed "the Note under contract-interpretation principles." Final Report at 21.

[74] D.I. 80.

matter was reassigned to the undersigned solely for the purpose of hearing the Exceptions.[75]  The parties completed briefing on the Exceptions on October 25.[76]

**IT IS ORDERED** this 28th day of February, 2025, that judgment is entered in Summit's favor.

1.     A hearing on the exceptions is unnecessary.  The Court has considered *de novo* the rulings in the Final Report and the record at trial.[77]

2.     The threshold dispute is whether the Note is a "notation" under Section 20-70(a).  If it is, that ordinance makes plain that only the County has the right to enforce the easement in the Note.[78]  I conclude the Note is a "notation" under Section 20-70(a) enforceable only by the County.

3.     Something more—proven by clear and convincing evidence—would be required to show Carter created an express easement enforceable by Reybold. The Note and Record Plan are insufficient.  Reybold has not proven Carter intended to create an easement burdening the Summit Parcel in favor of the Reybold Parcel that is enforceable by Reybold.

---

[75] D.I. 82.

[76] D.I. 84; D.I. 86; D.I. 87.

[77] *See DiGiacobbe*, 743 A.2d at 184.

[78] New Castle Cty. C. § 20-70(a) (1982).

## A. The Note Is A Notation Under Section 20-70(a).

4. Ordinance interpretation follows well-established canons of statutory interpretation.[79] Those principles are "designed to ascertain and give effect to the intent of the legislators, as expressed in the statute."[80] A threshold determination is "whether the provision in question is ambiguous."[81] That inquiry begins "with the statutory text."[82] "[A] statute is ambiguous only if it is reasonably susceptible of different interpretations."[83] If a statute is plain and unambiguous, "th[e] [c]ourt's role is limited to applying the literal meaning of the [statute's] words."[84]

5. "Undefined words in a statute must be given their ordinary, common meaning."[85] "Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, [courts] often rely on them for assistance in determining the plain meaning of undefined terms."[86] "When a

---

[79] *Dewey Beach Enter., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2010) (applying the "well settled" "rules of statutory construction" to interpreting a zoning code).

[80] *Chase Alexa, LLC v. Kent Cty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010).

[81] *Dewey Beach Enter.*, 1 A.3d at 307.

[82] *Tesla Inc. v. Del. Div. of Motor Vehicles*, 297 A.3d 625, 631 (Del. 2023).

[83] *Chase Alexa*, 991 A.2d at 1151.

[84] *1001 Jefferson Plaza P'ship, L.P. v. New Castle Cty. Dep't of Fin.*, 695 A.2d 50, 52 (Del. 1997).

[85] *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994).

[86] *Freeman v. X–Ray Assocs., P.A.*, 3 A.3d 224, 227–28 (Del. 2010).

15

statute has been applied by courts and state agencies in a consistent way for a period of years, that is strong evidence in favor of that interpretation."[87]

6. In unambiguous terms, Section 20-70(a) first explains that "all notations appearing on a record plan … shall have the effect of restrictive covenants . . . in favor of the county council."[88] It then explains, "the right to enforce such covenants shall lie exclusively with the county council and . . . shall not imply the creation of any private property or contract rights."[89]

7. The New Castle County Code does not define "notations." I construe that term according to its "ordinary, common meaning,"[90] with references to dictionary interpretations.[91] According to dictionary sources, "notation" is synonymous with "note." Black's Law Dictionary defines "notation" in "English probate practice," describing it as "the act of making a memorandum of some special circumstance on a probate or letters of administration."[92] It equates "notation" with the act of making a note. Garner's Modern English Usage does not define

---

[87] *State v. Barnes*, 116 A.3d 883, 890 (Del. 2015).

[88] New Castle Cty. C. § 20-70(a) (1982).

[89] *See id.* The parties do not contend Section 20-70(a) is ambiguous. *See e.g.*, D.I. 86 at 33–34; PTO at 10 (Summit conceding that "[t]here's nothing ambiguous about Section 40.31.810 of the Code, or its predecessor").

[90] *Oceanport Indus.*, 636 A.2d at 900.

[91] *Freeman*, 3 A.3d at 227–28.

[92] *See Notation*, BLACK'S LAW DICTIONARY (4th ed. 1968). Black's Law Dictionary stopped defining "notation" after that edition.

"notation," but defines its verb form, "notate."[93] It defines the verbs "notate" and "note" synonymously in the same entry, with the former "a BACK–FORMATION from *notation* dating from the 1870s, [and] is a NEEDLESS VARIANT except in reference to musical notation."[94]

8. With "notation" defined as a note, it follows that the Note is a "notation" under Section 20-70(a). It is, of course, Garner's note; and it is Black's memorandum of a special circumstance, albeit in a different legal context. The Note was born of DelDOT's concerns, in keeping with a notation creating an easement enforceable only by the County.[95]

---

[93] In aid of statutory interpretation, "[d]oing so makes sense grammatically because ['notate'] is simply a verbal form of the noun ['notation']." *Buckeye P'rs., L.P. v. GT USA Wilm., LLC*, 2022 WL 906521, at *11 (Del. Ch. Mar. 29, 2022).

[94] *See Note; Notate*, GARNER'S MODERN ENGLISH USAGE (5th ed. 2022) (capitalization in original). Garner's aversion to the word "notation" is noted.

[95] Forsten Tr. at 29 (testifying that the Note in part "captures exactly what DelDOT wants and wanted -- that they wanted one entrance, not multiple entrances"); *id.* at 47–48 (explaining that DelDOT "wants to have as few access points as possible so as to eliminate potential for accidents, to increase the flow of traffic"); Heisler Tr. at 54–55 (testifying that cross easements are meant to "try to reduce access points" for "safety and traffic flow"); Tarabicos Tr. at 108 (explaining that because "[t]here's a lot of interest on the County's part and DelDOT's to have internal connection," "DelDOT's obsessed with reducing the number of entrances onto their highways"); Casper Tr. at 199 ("[I]t's [DelDOT's] desire to have as few points of access to their highway."); *see also* JX 7 (DelDOT noting that "***we*** would not want additional access points affecting the operation of the [] intersection" (emphasis added)); JX 11 ("[DelDOT] would be amenable to pursuing a cross-easement agreement between subject parcel and the R–2 parcel.").

17

9.      Evidence of "courts['s] and state agencies[']" consistent application of Section 20-70(a) further confirms my interpretation of Section 20-70(a).[96]  This is not the first court to hold a record plan note is a "notation" under that provision.  In *Greylag 4 Maintenance Corp. v. Lynch-James*, the plaintiff sought to enforce a record plan note that specified the maximum permissible square footage against the defendant property owner.[97]  The note stated, "All building structures shall maintain a minimum of 100 feet separation and an area of less than 3,000 sq. ft. as per off[ice] of state fire marshall [sic]."[98]  Construing an ordinance identical to Section 20-70(a),[99] the court granted summary judgment to the defendant, concluding the ordinance expressly reserved the "exclusive responsibility to enforce the notes" to the County and the plaintiff had no private right of enforcement.[100]

---

[96] *See Barnes*, 116 A.3d at 890; *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.7 (Del. 1997) (instructing trial courts need not use extrinsic evidence to interpret an unambiguous contract but may "consider some undisputed background facts to place the contractual provision in its historical setting without violating" the foundational principles of contract interpretation); *see also Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1040 (Del. Ch. 2020) ("The statute must be read as a whole in a manner that will promote its purposes." (internal quotations marks and citation omitted)).  Although *Eagle Industries* concerns contract interpretation, similar principles of interpretation apply to construction of statutes.  *See Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001) ("It is a fundamental principle that the rules used to interpret statutes, contracts, and other written instruments are applicable when construing corporate charters and bylaws.").

[97] 2004 WL 2694905 (Del. Ch. Oct. 6, 2004).

[98] *Greylag*, 2004 WL 2694905, at *1 (first alteration added).

[99] *Id.* at *8, *8 n.60 (quoting and citing New Castle Cty. C. § 20-70(a) (1987)).

[100] *Greylag*, 2004 WL 2694905, at *8–9 (internal quotation marks omitted).  Reybold casts *Greylag* as "imply[ing] that everything noted on a Plan can only be enforced by the

10. And the relevant agencies reviewing the Record Plan here used the term "note," not "notation," consistent with Garner's observation that the two are synonymous and that "notation" is outdated. Reybold's expert testified that over the his 35-year career as a real estate attorney, he did not recall ever seeing a record plan containing the word "notation."[101] The SAC's approval process of the Record Plan corroborates that testimony: the SAC members' written comments all requested a "note," not a "notation." The Department of Public Works asked that "a note [] be included" if no debris was to be buried onsite.[102] The State Fire Marshal requested a "plan note" stating that the fire emergency and extinguishing infrastructure was in accordance with State Regulation No. 14.[103] The SAC itself, adopting DelDOT's comments concerning "a cross-easement,"[104] requested that Bellafante "add the

---

County." D.I. 86 at 37. I disagree; I do not read *Greylag* to be so broad, or so narrow as to be inapplicable here (confined only to building improvements). No other "notes" were at issue in *Greylag*, nor did the court indicate its holding addressed anything other than the "3,000 square-foot limitation that is present in note 9." *Greylag*, 2004 WL 2694905, at *4, 8–9 (specifically limiting its holding that "summary judgment is granted with respect to those portions of the Complaint that seek to enforce the 3,000 square-foot limitation").

[101] Forsten Tr. at 22, 32.

[102] JX 9.

[103] JX 8.

[104] JX 11.

following [cross-easement] [N]ote to the plan."[105]  These agencies used the word "note," not "notation," consistent with dictionary definitions equating the two.[106]

### B. The Note—As A "Notation"—Is Enforceable Only By The County.

11. Having concluded the Note is a "notation," Section 20-70(a) is clear: "the right to enforce such covenants shall lie exclusively with the county council and . . . shall not imply the creation of any private property or contract rights."[107]  The parties do not dispute that standing alone, easements in "notations" are enforceable only by the County.[108]

12. The legislative history confirms Section 20-70(a) was not intended to confer a private right of action.[109]  It was part of an overall plan of "governmental intent" to regulate "land development" within New Castle County, and to empower

---

[105] JX 12.

[106] *See* JXs 7–12.

[107] New Castle Cty. C. § 20-70(a) (1982).

[108] *See, e.g.*, PTO at 10–11 (Summit contending that "the enforceability of those notes, according to [Section 20-70(a)], is a right reserved only for the County"); D.I. 84 at 37, 40 (Summit arguing that notations "ha[ve] the effect of [] restrictive covenant[s]"); D.I. 86 at 1, 34–37 & n.114 (Reybold conceding that a "notation" is "a condition imposed by the County," but nonetheless seeking to distinguish "notations" from "notes"); Heisler Tr. at 79 (Reybold agreeing that only the County has the authority to modify or change the Note).

[109] *Greylag*, 2004 WL 2694905, at *8 (noting that absent a "legislative intent to provide" a private right of action, "a violation of a code or statute does not automatically confer on the victim the right to bring a lawsuit").

government enforcement.[110]  It was not intended to create or confer private property or contract rights.

13.  Section 20-70(a) was enacted in 1973 as part of the amendments to the New Castle County Subdivision and Land Development Regulations.[111]  Those amendments were intended to "combine and simplify the existing plan review procedures" by the County, and Section 20-70(a) was part of the "entirely new material" intended to "cover[] general criteria for provision of required physical development improvements" and to "obviate the need for obtaining separate sets of deed restrictions."[112]

14.  Later amendments to Section 20-70(a), and its most recent codification in the County's Unified Development Code ("UDC"), lend further support to interpreting Section 20-70(a) as a vehicle for County regulation of land development, not a font for private property or contract rights.[113]  Section 40.31.810

---

[110] *Recommendation on Proposed Amends. to "Phase I" (Sections 3, 4, 5, 7, and 8, and Appendices IV, V, VI, VII, IX and X) of the Subdivision and Land Dev. Reguls. of New Castle Cty.; And on Proposed "Phase II" (Sections 2 and 6, And Appendices XI–XIII) Additions Thereto To The Council of New Castle Cty.: Hearing on S–4 Before New Castle Cty. Dep't of Planning and New Castle Cty. Planning Bd.*, at 3 (1992) ("1973 Ordinance Background").

[111] *See* 1973 Ordinance Background at 3; *see also* New Castle Cty. Ordinance 73-103 (June 17, 1973).

[112] *See* 1973 Ordinance Background at 3–6.

[113] *Greylag*, 2004 WL 2694905, at *8 n.60 (observing that Section 20-70(a) in the 1987 version of the New Castle County Code, its subsequent amendments, and U.D.C. § 40.31.810 all contain "language that is substantively similar" to Section 20-70(a)).

of the UDC is identical to Section 20-70(a), except for an additional prefatory sentence.[114] That sentence states, "The Department shall have the authority to impose conditions on a record plan which shall appear as notations on the record plan."[115] This sentence confirms that the County has the authority to impose conditions, and the exclusive power to enforce those conditions.

15. The Note is a notation creating an easement that only the County, and not Reybold, can enforce.

## C. Reybold Has Failed To Prove Carter Intended to Create An Express Easement.

16. Reybold must look elsewhere to prove Carter intended to create an express easement favoring the Reybold Parcel that Reybold can enforce.[116] Reybold concedes "[t]he only evidence in this case relating to Carter's intent is the [Record] Plan itself."[117] The inquiry turns on whether the Record Plan contains "plain and

---

[114] U.D.C. § 40.31.810.

[115] Id.

[116] Reybold did not attempt to argue or prove other types of easements other than an express easement. D.I. 70 at 1–2, 5, 8; D.I. 86 at 8, 13.

[117] D.I. 86 at 11. Reybold has advanced no other basis for an easement. Heisler Tr. at 86 (conceding that "the easement agreement is [the Record Plan]"); Tarabicos Tr. at 152 (agreeing that "aside from this [Record] [P]lan, there is no separate easement agreement anywhere").

direct language evidencing [Carter's] intent to create" an express easement.[118] I find it does not.

17.   Delaware's long "settled policy of the law favors the free use of land."[119] A "recorded document" may impose restrictions against free use if the document "by clear and convincing evidence" "reflect[s] an unambiguous intention to impose them."[120]   "An easement is a non-possessory interest in real property, granted for a particular purpose, enforceable of right and not depend[e]nt for its continued existence on the will of the grantor."[121]   "[E]asement[s] may be created in any of several ways: by express grant or reservation, by implication, by necessity, or by prescription."[122]   An express easement is created if the document "contains plain and direct language evidencing the grantor's intent to create a right in the nature of the easement."[123] "[A]n easement generally must be established by

---

[118] *Rago v. Judge*, 1989 WL 25802, at \*5 (Del. Ch. Mar. 16, 1989) (alteration added) (internal quotation marks and citation omitted), *aff'd*, 570 A.2d 253 (Del. 1990).

[119] *Leon N. Weiner & Assocs., Inc. v. Krapf*, 623 A.2d 1085, 1092 (Del. 1993);  *see also Gammons v. Kennett Park Dev. Corp.*, 61 A.2d 391, 397 (Del. 1948) (noting "the settled policy of the law which favors the free use of land and which places the burden of establishing the existence and the right to the benefit of a restriction upon him who asserts it").

[120] *Krapf*, 623 A.2d at 1088, 1092–93.

[121] *Coker v. Walker*, 2013 WL 1858098, at \*3 (Del. Ch. May 3, 2013).

[122] *Judge v. Rago*, 570 A.2d 253, 255 (Del. 1990).

[123] *Black v. Staffieri*, 2014 WL 814122, at \*2 (Del. Feb. 27, 2014) (TABLE) (alteration omitted) (internal quotation marks and citation omitted).

clear and convincing evidence."[124] "In determining the intent of the parties, [courts] must give the words of the [r]estrictions their plain and ordinary meaning."[125] "[T]he party advocating for the land use restriction bears the burden of demonstrating the restriction is valid and enforceable."[126]

18. Reybold's argument for an express easement is three-fold: (1) the Record Plan contains the Note referencing the easement; (2) Carter signed and certified the Record Plan; so (3) Carter intended to create an express easement. The Note states, "A CROSS EASEMENT IS HEREBY ESTABLISHED[.]"[127] Reybold does not dispute that "the impetus for the [Note] was DelDOT," not Carter.[128] Thus, the question of Carter's intent turns on her single act of signing and certifying the Record Plan, and whether such action alone sufficiently conveyed an intent to create an easement. Under the facts of this case, I think not.

19. There is no evidence that Carter was involved in the creation, development, or revisions of the Record Plan. That process was led by Bellafante

---

[124] *Buckeye*, 2022 WL 906521, at *2 n.2 (quoting 25 Am. Jur. 2d Easements & Licenses § 14, Westlaw (database updated Feb. 2022)).

[125] *Mendenhall Vill. Single Homes Ass'n v. Harrington*, 1993 WL 257377, at *2 (Del. Ch. June 16, 1993).

[126] *New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 746 (Del. Ch. 2013), *aff'd*, 105 A.3d 990 (Del. 2014).

[127] PTO ¶ 6; *see also* JX 22.

[128] D.I. 86 at 13.

acting as the "agent of [the Developer]."[129]  No evidence indicates Carter was involved in that process, or was included in or aware of the communications and correspondence among Bellafante, the SAC, or the Developer leading up to the Record Plan's approval.  No evidence suggests that Carter:

- received the Department of Planning's comments to Bellafante's exploratory plan;[130]

- was notified that the preliminary plan "ha[d] been quantitatively accepted" for the SAC's review at its August 8 meeting;[131]

- received notice or was otherwise aware of, or attended that meeting;[132]

- received the SAC's comments to Bellafante's preliminary plan;[133]

- contributed to Bellafante obtaining the requisite letters of no objections; or

- reviewed or was otherwise involved in Bellafante's revisions to and submission of the Check Print with the SAC's comments incorporated, including adding the Note.[134]

---

[129] JX 2; *see also* Tarabicos Tr. at 122 ("[Q:]  Who  is typically responsible for submitting a record plan to the County?  A:  The civil engineer for the – whoever the party is.  I don't think the party here was Viola Carter.  I am assuming it was [the Developer].").

[130] *See* JX 3.

[131] JX 4.

[132] JX 4; JX 5.

[133] *See, e.g.*, JX 7; JX 12.

[134] *See* JX 13; JX 14.

20.     The earliest indication of Carter's potential involvement was discussing the Check Print bearing DelDOT's requested Note with the Developer.[135] But there is no evidence she actually saw or discussed it. There is no other evidence that Carter intended to create an easement enforceable by Reybold by signing the Certification. She was entirely absent from the Record Plan's development process. She was not involved until after Bellefante had included the Note in the Check Print and the Department of Planning had approved the Check Print.[136] The Note could have not reflected Carter's intent to create an easement.

21.     Carter's only documented involvement was her signed Certification on the Record Plan.[137] That Certification provides:

> I, Viola Carter, widow, hereby certify that I am the owner of the property shown on this plan, and the subdivision plan thereof was made at my direction, that I acknowledge the same to be my act and plan and desire the same to be recorded as such according to law, and in accordance with the subdivision and land development regulations of New Castle County, and that all streets shown and not heretofore dedicated are hereby dedicated to the public use, and that all proposed monuments will be set at the locations shown, and furthermore, I voluntarily agree to subdivide and develop the land in accordance with the concepts shown on the approved record plan.[138]

---

[135] JX 16.

[136] *Id.*

[137] JX 22.

[138] *Id.*

22. Carter's isolated act of certifying and signing the Record Plan containing the Note does not "clear[ly] and convincing[ly]"[139] convey an intent to create an easement. In plain terms, the Certification certifies Carter's ownership of the parcels, agrees with the subdivision plan as shown on the Record Plan, agrees it can be recorded, and agrees to dedicate public streets, to permit monuments, and to subdivide the land as shown. That language acknowledges the Record Plan for what it is, which includes the Note as a restrictive covenant enforceable only by the County. It does not contain "plain and direct language evidencing [Carter's] intent to create a right in the nature of the easement" for the Reybold Parcel,[140] as it must to create an easement enforceable by Reybold. It does not create any additional rights or obligations beyond "the concepts shown on the approved record plan,"[141] in which the easement is enforceable only by the County. Merely certifying and signing the Record Plan offers no evidence of any independent intent by Carter to create a private right of easement in favor of parcels encumbered in "the other lands of Viola Carter," much less specifically the Reybold Parcel.

23. Carter's Certification does not reference "a cross easement": only the Note does.[142] For the Certification to evidence an "intent to create a right in the

---

[139] *Buckeye*, 2022 WL 906521, at *2 n.2.

[140] *Black*, 2014 WL 814122, at *2.

[141] JX 22.

[142] *Id.*

nature of the easement,"[143] the Note itself would have to establish a private easement. But that conclusion is forbidden by Section 20-70(a), which plainly states that "notations appearing on a record plan . . . shall not imply the creation of any private property or contract rights."[144]

24. The Certification's origin further shows it does not prove Carter intended to create an express easement. The Certification was not a bilaterally negotiated contract presumably reflective of the parties' objectively evaluated intent.[145] It was not Carter's idea or expression. It was required by the New Castle County Code and follows "the wording" specified in the Code.[146] Today, decades

---

[143] *Black*, 2014 WL 814122, at *2.

[144] New Castle Cty. C. § 20-70(a) (1982).

[145] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) ("Delaware adheres to the objective theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." (internal quotation marks and citation omitted)).

[146] New Castle Cty. Ordinance 73-103, Ex. O (June 17, 1973). That ordinance amended the required form language for Certification of Ownership to state:

> The following certification, in the wording shown, must be labeled and completed on the Record Plan for all plans except Street Plans: I/we, [name of owner or owners] , hereby certify that [I am/we are] the owner(s) of the property shown on this plan, and the subdivision plan thereof was made at (my/our/its) direction, that (I/we/it) acknowledge(s) the same to be (my/our/its) act and plan and desire(s) the same to be recorded as such according to law, and in accordance with the Subdivision and Land Development Regulations of New Castle County, and that all streets [and open spaces contained in lots number] shown and not heretofore dedicated are hereby dedicated to the public use [except those labeled "not for dedication"] , and that all proposed street monuments shown hereon will be set at the locations shown [and furthermore that I/we/it voluntarily agree(s)

later, the UDC still requires the property owner to sign a certification of ownership with similar form language.[147] The trial record contains other record plans spanning from 1989 to 2021, each containing a signed certification of ownership substantially similar to Carter's Certification.[148] Carter's ministerial act of placing her signature under stock language mandated by the New Castle County Code for recording does not imbue that signature with the specific intent to create an express easement.

25. Reybold argues the Certification evidences Carter's intent to create an easement based on cases where easements were found within a record plan.[149] But in each of Reybold's cited cases, the record plans depicted or delineated a private easement.[150] None of those decisions found an intent to create an easement based

---

to subdivide and develop the land in accordance with the concepts shown on the approved Record Plan]_ .

[147] U.D.C. § 40.33 (defining "certification of ownership" as "[a] statement bearing the signature of the owner of the subdivision or land development stating that all dedications are offered to the County, State, or private utilities"). The UDC requires that record plans' submission and recordation follow the process in Appendix 1 thereto, which specifies a record plan to include a "Certification of Ownership" with the following language:

I _____ hereby certify that I am the owner of the property which is subject of this plan and that the land use action proposed by this plan is made at my direction and that I authorize this plan to be recorded in accordance with the regulations of the New Castle County Unified Development Code.

See U.D.C. § 40.33. Appendix 1 (Application and Land Requirements).

[148] JXs 25–28; JX 31; JX 32; JX 35; JX 37; JX 39; JX 44.

[149] D.I. 86 at 14–18.

[150] See, e.g., Green v. Templin, 2010 WL 2734147, at *2 (Del. Ch. July 2, 2010) ("The Easement is depicted on the 1974 Plan with dashed lines and the words 'Easement-20''."); Alpha Builders, Inc. v. Sullivan, 2004 WL 2694917, at *1, *4 (Del. Ch. Nov. 5, 2004) ("[The plan] depicted a 50 foot right-of-way."); Ptak v. Rowe, 1976 WL 8273, at *1 (Del.

on the property owner's certification of the record plan bearing a notation enforceable by the County.

26. The Note creates an easement enforceable only by the County, and Reybold has not proven an easement it can enforce. Judgment should be entered in Summit's favor.

*/s/ Morgan T. Zurn*

Vice Chancellor Morgan T. Zurn

---

Ch. Feb. 19, 1976) (explaining the record plan contained "building restriction lines, a drainage and sewer easement . . . [and] a '20' Right of Way to School Property'"); *Judge*, 570 A.2d at 254–55 (observing the schematic diagrams of the record plan delineating "access ways" and "common areas").